NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 241316-U

NO. 4-24-1316

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 29, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| CLARENCE HOPSON, | ) | No. 22CF1105 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Adam Giganti, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Steigmann and Justice Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed defendant's convictions where defendant's arguments were forfeited and not cognizable under the second prong of the plain-error doctrine.

¶ 2    In July 2024, a jury found defendant, Clarence Hopson, guilty of aggravated domestic battery (720 ILCS 5/12-3.3(a) (West 2022)), attempted first degree murder (720 ILCS 5/8-4, 9-1(a)(1)) (West 2022)), home invasion (720 ILCS 5/19-6(a)(1) (West 2022)), and aggravated stalking (720 ILCS 5/12-7(a) (West 2022)). The trial court sentenced defendant to a total of 40 years in prison. Defendant appeals, arguing that (1) the court inadequately admonished him before accepting his waiver of counsel and (2) the court violated his due process rights by failing to give him the opportunity to poll the jury after the pronouncement of its guilty verdicts. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4        In November 2022, the State filed a one-count information against defendant, alleging he committed the offense of aggravated domestic battery (720 ILCS 5/12-3.3(a) (West 2022)) where he "knowingly caused great bodily harm or permanent disfigurement to Kellie Brand, a family or household member of said defendant, in that said defendant sliced and stabbed Kellie Brand in the neck and wrist with a box cutter." Defendant appeared before the trial court in December 2022, where the court informed him of the charge and the possible sentence. The court appointed the public defender's office to represent defendant. Defendant pleaded not guilty.

¶ 5        On December 14, 2022, a grand jury returned an indictment, alleging that defendant committed the offenses of aggravated domestic battery (720 ILCS 5/12-3.3(a) (West 2022)), attempted first degree murder (720 ILCS 5/8-4, 9-1(a)(1)) (West 2022)), home invasion (720 ILCS 5/19-6(a)(1) (West 2022)), and aggravated stalking (720 ILCS 5/12-7(a) (West 2022)). On December 27, 2022, defendant's privately hired attorney filed an entry of appearance.

¶ 6        On December 22, 2023, the trial court held a hearing on defense counsel's motion to withdraw. Counsel informed the court that there was "a breakdown in the attorney-client relationship." The court allowed the motion. Defendant indicated that he did not intend to hire a new attorney and did not want the public defender, stating that he would "go *pro se*." The court gave defendant a document entitled "Waiver of Right to Counsel." The court went through the waiver and explained the advantages of having an attorney and disadvantages of representing oneself. The court accepted defendant's waiver.

¶ 7        At a pretrial hearing on June 24, 2024, the trial court asked defendant if he would like to have time to work with the State to see "if there's any possible resolution." Defendant declined and indicated that he would like to proceed to trial. At the final pretrial conference on

July 17, 2024, the court asked the State to go through the charges and their possible sentences. The court summed up that if defendant were convicted of all four charges, his possible sentence would be between 14 and 130 years. When asked, defendant confirmed he had no questions about the sentencing ranges of any of the charges.

¶ 8 Trial began on July 22, 2024. When asked, defendant indicated he still wished to proceed *pro se*. The following evidence was presented.

¶ 9 Defendant and Kellie Brand dated for about five years, during which they also lived together. Their relationship ended in May 2022. Brand testified that she and defendant remained friendly through the summer of 2022. Though he did not have keys to her house between May and October 2022, Brand stated that she gave defendant keys to her house again in October 2022 so that he could let her dog out while she was working. Brand testified that she saw defendant numerous times between mid-October and mid-November 2022. One night in October 2022, Brand woke up to find defendant standing over her. She testified that he "was going back and forth between whether he was going to let [her] leave or whether he wanted to kill [her]." She was able to convince defendant to leave her house and return her house keys. Afterward, she changed the locks in her house, got a new motion sensor light for the front of the house, and set up an Amazon Alexa device to call 911 if she instructed it to "call Nanny." On other occasions, defendant would "show up at the house and stand at the sliding glass door with a cinderblock and tell [Brand] that he was going to throw it through the sliding door" at the back of the house. She also saw him outside her house in his car; he once blocked her car with his and would not allow her to leave.

¶ 10 On the morning of November 12, 2022, Brand came home between 12 and 1 a.m. after going out with her friend, Danielle Watts. When she arrived home, she saw a car "on the side of the road facing [her], no lights turned on." She was on the phone with Watts and told her she

was worried it was defendant. Defendant then called Brand and told her he was at work, though she could "hear that he was in the car." He said that "he knew [Brand] was with another man." Brand texted Watts and asked her to call 911 because defendant "was threatening to kill [Brand]." When the police arrived, defendant had left. Defendant continued to call and text Brand. Brand eventually went to sleep but woke up to the sound of the glass door shattering. Defendant then "ran in, and he grabbed [her] by [her] hair and he threw [her] on the floor." They proceeded to struggle; defendant had a box cutter and "slit [her] throat twice and then slashed [her] neck and then held [her] arm out and slashed [her] wrists." He then got up, "stomped on [her] face," and left. During the attack, defendant told Brand, "I told you you weren't going to f*** with me, I told you I would do it." Brand ran out of the bedroom after him and saw him run across the street to his black car. Brand called 911, identified herself, and told the dispatcher that defendant had attacked her with a box cutter and slashed her throat and her wrists. The trial court admitted a recording of the 911 call without objection.

¶ 11        The police and an ambulance arrived a few minutes later. Officers located the box cutter with which defendant had attacked Brand in her bedroom. Paramedics controlled Brand's bleeding and transported her to the hospital. As a result of the attack, Brand had "three lacerations on her forearm, one on her chin, and then one on the side of her neck." Though doctors ultimately determined there was no damage to any major blood vessels and her injuries were not life-threatening, Brand had some "numbness of her lower face" that indicated the laceration on her chin damaged a superficial nerve in that area. The wounds on her neck, chin, and wrists totaled around 19 centimeters and required 23 stitches. An expert in DNA analysis testified that the blood on the blade belonged to Brand, while the DNA on the handle belonged to both defendant and Brand. GPS data from defendant's cell phone service provider showed that his phone was located

on Brand's block at 12:57 a.m. and 5:26 a.m. on November 12, 2022.

¶ 12    Defendant was eventually located and arrested in Vail, Colorado. When interviewed by police, defendant admitted to being in Brand's home in October 2022, claimed he did not remember anything after 1 a.m. on November 12, 2022, because he had been drinking, and admitted that he did own a "silver folding box cutter with a blade that inserts on the top of it," which was consistent with the box cutter recovered from Brand's bedroom on November 12, 2022.

¶ 13    At trial, defendant did not cross-examine any witnesses, present any evidence, call witnesses, testify, or make a closing argument. The jury began deliberations at 11:51 a.m. and returned a verdict at 12:30 p.m. The jury found defendant guilty of all four charges against him. After reading the verdicts, the trial court asked, "Mr. Foreperson, are these the verdicts of the jury?" The foreperson confirmed that they were the verdicts. The court then said,

> "All right. Clerk is directed to enter the verdicts of record. And ladies and gentlemen, we are now, we have concluded this trial. And I've learned over time usually I thank everyone, which we do, we thank you all, and I go through how important this is, an important process, and your service and your duty, and I go on and on and on, but I think all of you already know that and probably want to get out of here and go home. So we're going to do that. So the jury is dismissed, and the bailiff is going to take you down."

¶ 14    The trial court held a sentencing hearing on October 3, 2024. The parties declined to present evidence in aggravation or mitigation, but Brand provided a victim impact statement. Defendant made a statement in allocution. The court ultimately sentenced defendant to a total of 40 years in prison: 5 years for aggravated stalking, 10 years for home invasion, and 25 years for attempted first degree murder, to run consecutively. The court found that counts I and II (attempted

first degree murder and aggravated domestic battery) merged.

¶ 15    This appeal followed.

¶ 16                    II. ANALYSIS

¶ 17    On appeal, defendant argues that (1) the trial court inadequately admonished him before accepting his waiver of counsel and (2) the court violated his due process rights by failing to give him the opportunity to poll the jury after the pronouncement of its guilty verdicts. He acknowledges that he forfeited both arguments by failing to raise them in the trial court but invokes the second prong of the plain-error doctrine.

¶ 18    Under the plain-error doctrine, the defendant has the burden of showing that a clear or obvious error occurred and either that (1) the evidence is closely balanced or (2) the error was so egregious as to deny the defendant a substantial right and thus a fair trial. *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). Here, defendant claims both errors are reversible under the second prong.

¶ 19                    A. Rule 401(a) Admonishments

¶ 20    Defendant first argues that the trial court committed second-prong plain error when it failed to admonish him about the charges against him and the minimum or maximum sentences before accepting his waiver of counsel. The State concedes on appeal that the court did not advise defendant of this information but maintains that defendant has forfeited the issue and was in any case not prejudiced.

¶ 21    Under "both the United States and Illinois Constitutions [(U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8)], a defendant has the right to represent himself in criminal proceedings." *People v. Burns*, 2012 IL App (4th) 110670, ¶ 11. A defendant's waiver of this right "must be clear and unequivocal." *Burns*, 2012 IL App (4th) 110670, ¶ 11. To ensure that a

defendant's waiver meets these requirements, Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) requires the trial court to address:

> "(1) the nature of the charge;
>
> (2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and
>
> (3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court."

However, only substantial compliance with this rule is required. *People v. Ratliff*, 2024 IL 129356, ¶ 44. Even where a court fails "to mechanically follow the rule, when an examination of the record indicates that (1) the waiver of counsel was made knowingly and intelligently and (2) the trial court's admonishment did not prejudice the defendant's rights, reversal is unwarranted." *People v. Johnson*, 2023 IL App (4th) 210662, ¶ 76.

¶ 22            In *Ratliff*, though the defendant pleaded guilty, which obviated concerns that any Rule 401(a) admonishment error undermined the fairness of trial, the supreme court continued to consider more broadly whether a Rule 401(a) admonishment error could amount to second-prong plain error. See *People v. Anderson*, 2025 IL App (2d) 230077-B, ¶ 26 (declining to limit *Ratliff*'s application to cases where the defendant pleaded guilty). The court concluded that a previous line of cases "created the proposition that Rule 401(a) violations are second-prong plain error out of thin air." *Ratliff*, 2024 IL 129356, ¶ 34. The court emphasized,

> "while Rule 401(a) is a safeguard that is designed to help ensure that the defendant is afforded an important constitutional right [citation], the rule is tangential to the constitutional right itself. Nothing in the federal or state constitutions requires any

admonitions before a defendant may waive the right to counsel, which explains why we have repeatedly held that the trial court need only substantially comply with the rule. [Citations.] The fact that substantial compliance is sufficient indicates that a Rule 401(a) violation, if pressed in a postplea or posttrial motion, would be subject to a record-intensive and prejudice-focused harmless error analysis. If such a violation rose to the level of structural error, strict compliance would be required. Stated differently, it is conceivable that a defendant could knowingly and voluntarily waive the right to counsel, proceed *pro se*, and still have a fair trial without the admonitions." (Internal quotation marks omitted.) *Ratliff*, 2024 IL 129356, ¶ 44.

The court thus concluded that "[b]ecause a Rule 401(a) violation is not akin to structural error, such a violation, if not raised in a postplea or posttrial motion, is not cognizable as second-prong plain error but only as first-prong plain error." *Ratliff*, 2024 IL 129356, ¶ 46.

¶ 23    Here, defendant does not contend the evidence was closely balanced; he argues only that the error amounted to second-prong plain error. Notably, he does not acknowledge *Ratliff* on appeal. However, *Ratliff* clearly established that a Rule 401(a) violation is not cognizable as second-prong plain error. Defendant's argument is therefore forfeited.

¶ 24    While defendant's argument is forfeited and the error is not reversible in this case, this error could easily have been avoided by spending just a few additional minutes to ensure compliance with the rule. We remind the trial court that providing defendants with the appropriate admonishments prior to waiving counsel is required by Rule 401(a) to provide a very important "safeguard that is designed to help ensure that the defendant is afforded an important constitutional right" and should be done in every case. (Internal quotation marks omitted.) *Ratliff*, 2024 IL

129356, ¶ 44.

¶ 25                                    B. Jury Polling

¶ 26        Defendant next argues that the trial court committed second-prong plain error when it denied him the opportunity to poll the jury following the pronouncement of its guilty verdicts. The State concedes that the court did not give defendant time to poll the jury but contends that jury polling is not a structural error under the second prong of the plain-error doctrine.

¶ 27        A defendant's "right to request a polling of the jury is a safeguard that is designed to help ensure that the defendant is afforded an important constitutional right, *i.e.*, juror unanimity." *People v. Jackson*, 2022 IL 127256, ¶ 33. However, "[a]lthough polling the jury is designed to safeguard a fundamental right, this conclusion alone does not establish that an error in polling the jury is structural error." *Jackson*, 2022 IL 127256, ¶ 36. Ultimately, our supreme court held that "the circuit court's error in polling the jury is not structural error." *Jackson*, 2022 IL 127256, ¶ 44. In so concluding, the court noted that "the right to poll the jury is a rule established by our state's common law and is a procedure that is available only to those defendants who request it." *Jackson*, 2022 IL 127256, ¶ 44. Instead of being a structural error,

> "[a]n error in polling a jury is better suited for harmless error analysis because there are other safeguards in place to ensure juror unanimity, including the circuit court's instructions to the jurors that their verdict must be unanimous, the requirement that all jurors have individually signed the jury verdict form, and the requirement that the signed verdict form is returned and pronounced in open court in the presence of the jury." *Jackson*, 2022 IL 127256, ¶ 46.

This means that "[w]hen the record is otherwise devoid of any indication of a lack of juror unanimity, a jury polling error alone does not justify reversing a conviction on the fear of denial

of the right to juror unanimity." *Jackson*, 2022 IL 127256, ¶ 47.

¶ 28    Defendant acknowledges that *Jackson* "declined to excuse the trial court's jury polling error under the second prong of the plain error analysis," but he contends that "the facts of this case warrant its application." However, this argument misses the point of the plain-error doctrine. The first prong provides review where the type of errors "are subject to harmless error analysis, and a defendant must establish prejudice resulting from the error to excuse his forfeiture of such an error" where the evidence of the defendant's guilt was closely balanced. *Jackson*, 2022 IL 127256, ¶ 23. In contrast, the second prong provides review only of errors that "undermine the integrity and reputation of the judicial process regardless of the strength of the evidence or the effect of the error on the trial outcome," and a court may thus presume prejudice. *Jackson*, 2022 IL 127256, ¶ 24. As discussed above, our supreme court has unequivocally decided that a jury polling error is not one of the types of errors that could be deemed structural. *Jackson*, 2022 IL 127256, ¶ 44. Because this type of error is subject to harmless-error review, it "can be excused under first-prong plain error standards, not under second-prong plain error standards." *Jackson*, 2022 IL 127256, ¶ 53. However, defendant has not invoked the first prong of the plain-error rule. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited."). Because any error in the trial court's jury polling is not cognizable as second-prong plain error, defendant's argument is forfeited.

¶ 29                                         III. CONCLUSION

¶ 30    For the reasons stated, we affirm the trial court's judgment.

¶ 31    Affirmed.